*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ADAMS/DELACRUZ, Minors.

UNPUBLISHED
February 15, 2024

Nos. 366691; 366692
Gogebic Circuit Court
Family Division
LC No. 2021-000021-NA

Before: LETICA, P.J., and CAVANAGH and SWARTZLE, JJ.

PER CURIAM.

In Docket No. 366691, respondent-father, D. Gilmartin, appeals as of right the trial court's order terminating his parental rights to his son, LA, under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (g), and (j). In Docket No. 366692, respondent-mother, K. Reyna, appeals as of right the trial court's order terminating her parental rights to LA, IA, and MD under MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Respondent-mother's family came to petitioner's attention when there were allegations of sexual abuse of her two minor daughters, SA and OTM. At that time, respondent-mother had given birth to five children fathered by four different men. There were allegations that the family resided among three different trailers or that respondent-mother and her children occupied the lower level of a home that was shared with a paternal uncle. Respondent-mother allowed the paternal uncle to sleep in the same bed as the minor girls. Instead of following up with medical care for her daughters, respondent-mother sent them to live out of state with relatives. In addition to her two daughters, respondent-mother had three sons, two teenage boys, IA and MD,[1] and a toddler, LA, fathered by respondent-father.

---

[1] Approximately ten years earlier, these two children were removed from respondent-mother's custody when she resided in Georgia. The circumstances of their return to respondent-mother's care is unclear.

The three sons were removed from respondents' custody and placed with a foster family. In foster care, the boys had difficulty adapting to a structured environment with rules. Before being placed in foster care, the teenage boys did not regularly attend school, but were responsible for caring for as many as six young children at a time. Although it was represented that the teenage boys were caring for the children while respondent-mother worked, they did not believe that was true. LA did not verbally communicate, but merely grunted when he entered foster care at 18 months of age. The teenage boys also spoke of their home life as a violent environment where they were physically struck. Even the toddler, LA, had nightmares where he relayed hiding under tables or trampolines. LA also displayed aggressive behaviors when placed in daycare, including choking others. The teenage boys were afraid to finish packaged food items for fear that they would get into trouble. IA also reported trying to stay up as late as possible to be able to sleep through the chaos that occurred in their home during the night. IA did not respond to discipline through removal of privileges or electronic devices, noting that he was used to having nothing. MD did not like to have his privileges or devices removed and noted that he would rather be struck as a punishment. IA and MD were participating in counseling while placed in foster care, and LA initially received speech therapy. IA and MD suspected that something was happening to the girls by the paternal uncle because the girls received favorable treatment.

At first, respondent-mother participated in a case service plan and took steps to be reunited with her sons. She attended parenting time and brought home-cooked meals for the children. But, respondent-mother later brought the children fast food meals that caused digestive distress on their long car ride home. Additionally, respondent-mother brought a puppy to the visits for approximately one month and promised MD that he would have the puppy when he came back to live with her. She also brought third parties to the visits despite being advised to the contrary. At one point, respondent-mother did not communicate with her caseworker, and her participation lessened. The caseworker learned that respondent-mother moved further away from her children's foster-home placement. And, respondent-mother later disclosed that she was pregnant with her sixth child, a daughter DJ, that she gave birth to in Wisconsin. Respondent-mother initially resided with DJ and the infant's father, D. Jordan, until he went to a drug treatment facility and his criminal record was uncovered. IA and MD referred to DJ's father as a "bad dude." Although respondent-mother participated in aspects of her case service plan, IA did not want to return to her care, noting that she could not raise them in a manner that they deserved. MD expressed ambivalence about living with respondent-mother.

Respondent-mother had moved to Menominee, Michigan, and the court there declined to exercise jurisdiction over her newborn, DJ. But, respondent-mother was provided services.

Respondent-mother was married to another man at the time of LA's birth, but respondent-father established paternity to LA. Respondent-father experienced homelessness and drug use and frequently could not be contacted or located. When he was housed in the local jail, respondent-father pleaded no contest to allegations in the petition to allow the court to assume jurisdiction. Further attempts by the caseworker to communicate with respondent-father were futile until he was convicted of grand theft in Idaho and imprisoned in Arizona. Respondent-father agreed to a longer prison sentence to participate in a work-training program. His earliest release date was in December 2025. Respondent-father did not reciprocate the caseworker's attempts at correspondence, and he admitted that he "gave up." Respondent-father did not want his parental rights terminated and offered to participate in classes while in prison.

The trial court found statutory grounds to terminate respondents' parental rights and that termination of parental rights was in the children's best interests. From this decision, respondents appeal.

## II. STATUTORY GROUNDS FOR TERMINATION

Both respondents challenge the trial court's findings that statutory grounds for termination of their parental rights were established by clear and convincing evidence. We find no error in this regard.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000); *In re Richardson*, 329 Mich App 232, 251; 961 NW2d 499 (2019). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989); *In re Richardson*, 329 Mich App at 251.

The trial court terminated respondent-father's parental rights to LA under MCL 712A.19b(3)(a)(*ii*), (c)(*i*), (g), and (j), which permit termination under the following circumstances:

> (a) The child has been deserted under either of the following circumstances:
>
> * * *
>
> (*ii*) The child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period.
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court terminated respondent-mother's parental rights to LA, IA, and MD under MCL 712A.19b(3)(c)(*i*), (g), and (j).

## A. DOCKET NO. 366691 (RESPONDENT-FATHER)

After reviewing the record, we conclude that the trial court did not clearly err when it terminated respondent-father's parental rights to LA under MCL 712A.19b(3)(a)(*ii*). As noted, MCL 712A.19b(3)(a)(*ii*) permits termination if the parent has deserted the child for 91 or more days and has not sought custody to the child during that period. Respondent-father seemingly claims that the trial court found that his incarceration was tantamount to the desertion of his son. Respondent-father correctly recognizes that "[t]he mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination." *In re Mason*, 486 Mich 142, 160; 782 NW2d 747 (2010). However, the trial court did not terminate respondent-father's parental rights simply because of his inability to care for his child as a result of his incarceration. Instead, it was respondent-father's complete abdication of his parental responsibilities during LA's entire life that warranted termination of his parental rights under § 19b(3)(a)(*ii*).

The record evidence discloses that respondent-father did not initially establish paternity of LA following the child's birth in 2019. And, he admitted that even before the initiation of this case in April 2021, he had very little contact with LA. Indeed, he has only spent a total of five days with his son. The last time respondent-father saw LA was in February 2021. He admitted that he did not have a relationship with LA because he was frequently homeless, abusing drugs, and getting into trouble. When LA and the other children were removed from respondent-mother's care in April 2021, respondent-father was identified as LA's putative father. At that time, the court encouraged respondent-father to establish legal parentage of his child. There is no evidence that respondent-father made any effort to do so. Ultimately, the court found that respondent-father was LA's legal father at a hearing in June 2021 in light of respondent-mother's representations.

Despite the determination that he was LA's legal father, respondent-father only minimally participated in this child protective proceeding. Respondent-father entered his no-contest plea in October 2021, yet he did not attend the November 2021 dispositional hearing. He did not attend any of the parenting time he was offered with LA. Nonetheless, the court ordered respondent-father to comply with a treatment plan that was designed to address the barriers to reunification. Respondent-father made no effort to participate in any reunification services before he was arrested in December 2021 and charged with stealing an automobile. Shortly thereafter, respondent-father pleaded guilty and was sentenced in Idaho to serve four years' imprisonment. Respondent-father has been incarcerated since December 2021, with his earliest outdate in December 2025.

Respondent-father had at least six months after he was determined to be LA's legal father to demonstrate some commitment to his son before he was incarcerated. Other than attending the adjudication in October 2021, respondent-father took no action to seek custody of his child or

demonstrate that he wished to engage with or provide for LA. This was emblematic of respondent-father's entire track record as a father.

The caseworker explained the efforts that were made to engage respondent-father. Once respondent-father was declared LA's legal father, the caseworker attempted to schedule parenting time. When she called to schedule visits, she did not receive a response to her calls or text messages and could not otherwise reach respondent-father. Because respondent-father did not keep in contact with the caseworker, she was unable to reach him. Several months elapsed with no contact from respondent-father. When the caseworker finally discovered that respondent-father was incarcerated, she sent correspondence to him in both Idaho and a facility in Arizona where he was later transferred, but received no response to these communications. She did arrange a phone call with respondent-father while he was in the Idaho prison, but respondent-father refused to come to the phone. Notably, while respondent-father did attend the first two days of the termination hearing by Zoom, he refused to attend the final day of the hearing.

Respondent-father admitted that, after his incarceration, he simply stopped trying and did not advise the caseworker of his whereabouts for many months. He did not communicate with the caseworker because he believed that they had nothing to talk about. The record reflects that, despite respondent-father's incarceration, he was given opportunities to be involved in this child protective proceeding. However, he declined to participate and never actively sought to maintain his parental rights during his incarceration.

"[D]esertion is an intentional or willful act" that cannot be premised on a parent's involuntary conduct. *In re B & J*, 279 Mich App 12, 18-19 n 3; 756 NW2d 234 (2008). In this case, respondent-father's conduct was not involuntary, but purposeful and deliberate. Despite the court proceedings, respondent-father took no action to establish or maintain a relationship with his child. Accordingly, there was clear and convincing evidence to support termination of respondent-father's parental rights to LA under MCL 712A.19b(3)(a)(*ii*).[2]

### B. DOCKET NO. 366692 (RESPONDENT-MOTHER)

After reviewing the record, we conclude that the trial court did not clearly err when it terminated respondent-mother's parental rights to LA, IA, and MD under MCL 712A.19b(3)(c)(*i*).

The evidence established that in 2012, IA and MD were removed from respondent-mother's care by a Georgia court although it is unclear from the record when IA and MD resumed living with respondent-mother. In 2021, respondent-mother was living with her three sons, IA, MD, LA, two daughters, SA and OTM, and LA's paternal uncle in Michigan's Upper Peninsula. Respondent-mother knew that the paternal uncle would sleep in the same bed with her minor daughters. Respondent-mother discovered in March 2021 that at least one of her young daughters

---

[2] Although the trial court need only find one statutory ground to terminate, *In re Trejo*, 462 Mich at 355, we note that MCL 712A.19b(3)(c)(*i*) was also established. At the time the trial court rendered its decision, LA had been in foster care for nearly 22 months and was nearly four years old. Respondent-father was unable to provide a home for LA in light of his incarceration, and there was no indication that he rectified his domestic issues and could parent LA.

had been sexually abused. Rather than contacting the authorities and pursuing additional medical care, respondent-mother sent the girls to Kentucky to live with relatives. The father of respondent-mother's daughter took the child to a Kentucky hospital where medical personnel opined that bruising on the child's legs and vaginal tears, discharge, and swelling were indicative of sexual abuse. In April 2021, a petition was filed to remove all five children from the home. The petition included allegations of improper supervision, failure to protect, and educational and medical neglect. At the April 27, 2021 preliminary hearing, the court authorized the petition relative to respondent-mother's three sons, but refused to authorize the petition relative to the girls, who were still in Kentucky and subject to court orders in that state.

In August 2021, respondent-mother entered a no-contest plea to allegations that she was aware in March 2021 that her daughter had a vaginal rash, discharge, and bleeding, that medical personnel advised her that it could be related to sexual abuse, that respondent-mother failed to bring her daughter to two follow-up medical appointments, and that shortly thereafter, respondent-mother sent her daughter to live with the child's father in another state. Respondent-mother also pleaded no contest to allegations that she knew her daughters were sleeping in the same bed with a paternal uncle living in the home. And respondent-mother pleaded no contest to an allegation that she was using nonprescribed medications, including Adderall. The court accepted respondent-mother's no-contest plea and then found that there were statutory grounds to assume jurisdiction over respondent-mother's three sons. After the dispositional hearing that followed, respondent-mother was given an opportunity to participate in services designed to address the barriers to reunification.

The evidence further established that respondent-mother initially appeared to be making progress with her treatment plan, but in December 2021, she stopped communicating with her caseworker and failed to attend parenting time in December 2021 and January 2022. By the time in-person parenting time could resume, respondent-mother went four months without visiting her children. When the visits resumed, respondent-mother was less engaged, arrived late or without calling to confirm her attendance, and brought unauthorized individuals to the visits. Eventually, in July 2022, the court suspended respondent-mother's parenting time after determining that the visits with respondent-mother were detrimental to the children.

Approximately a year after the adjudication and more than 182 days after entry of the initial dispositional order, a supplemental petition was filed seeking termination of respondent-mother's parental rights. The petition alleged, among other things, that respondent-mother failed to benefit from the services offered.

During review hearings held between December 2021 and January 2023, and at the March and April 2023 termination hearings, the evidence presented established that while respondent-mother did comply with many of the requested services, she did not substantially comply with or benefit from the mental health component of her treatment plan. The evidence also clearly and convincingly established that respondent-mother would not be in a position to safely and appropriately parent her children within a reasonable time.

Notably, respondent-mother had not addressed the most significant barrier to reunification, her mental health issues. Each of the children had been traumatized by events in the home. Participating in mental health services would have improved respondent-mother's parenting skills.

With the assistance of a trained mental health professional, respondent-mother could have had a better understanding of how her parenting and life choices negatively impacted her children.

There was clear and convincing evidence that respondent-mother never meaningfully participated in appropriate mental health treatment. When the initial petition was filed in April 2021, respondent-mother was living in Ironwood, Michigan. She underwent a mental health assessment with therapist Harry Swanson and then attended two sessions with him. Respondent-mother admitted to her caseworker that she was on the verge of being discharged from the service for noncompliance. Then, in February 2022, she decided to move to Menominee, Michigan, which resulted in her being much farther from her children. Once respondent-mother relocated to Menominee, she did not initially start services with another therapist in her new community. When she did make some effort in this regard, she misrepresented the services provided. Respondent-mother sought treatment at Northpoint in March 2022. For almost a year, she reported to the caseworker that she was participating in therapy at Northpointe and her therapist was Beth Gunderman. The caseworker attempted to obtain treatment records and progress notes, but was unsuccessful. Eventually, the caseworker learned that Gunderman was a case manager, not a licensed therapist. Gunderman's role was simply to coordinate respondent-mother's services.

The evidence further established that respondent-mother did not truly start receiving mental health services until March 2023, after the start of the termination hearing. Indeed, respondent-mother testified that a psychiatrist prescribed medication for her anxiety the day before the March 3, 2023 termination hearing. Further, respondent-mother had only participated in two therapy sessions with an actual Northpointe therapist and those sessions occurred in the week preceding the last day of the termination hearing, which was April 6, 2023. In sum, the evidence demonstrated that at the time of the termination hearing, respondent-mother had just begun to address her mental health issues.

To the extent that respondent-mother did participate in services, she did not benefit. The children came into care, in part, because of respondent-mother's inability to protect them, substance use concerns, a history of domestic violence, and educational and medical neglect. Thus, respondent-mother's judgment and her assessment of safety risks was at issue. Respondent-mother's involvement with Jordan, the father of her sixth child, DJ, validates the conclusion that respondent-mother's judgment and ability to protect her children had not improved.

In approximately January 2022, respondent-mother became pregnant with DJ. The conception coincided with the month that respondent-mother's whereabouts were unknown. Respondent-mother claimed that she did not realize that she was pregnant until she was 16½ weeks along, despite that she had already experienced five other pregnancies. Respondent-mother did not inform the caseworker that she was pregnant. The caseworker discovered the pregnancy when she saw that respondent-mother was visibly pregnant at their July 2022 in-person meeting. During their previous monthly visits, respondent-mother did not disclose the pregnancy. Jordan fathered DJ, but respondent-mother did not know the identity of the child's father during her pregnancy.

After DJ's birth, Jordan lived with respondent-mother and the baby. At the January 19, 2023 review hearing, the caseworker disclosed her belief that Jordan had been convicted of giving children cocaine and watching pornography with them. At the termination hearing, respondent-mother testified that, after learning this information on January 19, 2023, she immediately kicked

Jordan out of her home. However, Samantha Strege, the service specialist for the Menominee County case that arose after DJ's birth, testified that Jordan left respondent-mother's home on February 24, 2023, to enter an inpatient treatment center to address his cocaine use. She further verified that, after one week of treatment, Jordan left the treatment facility without successfully completing the program. Thus, one could conclude that respondent-mother was in a relationship with an individual with a known substance abuse issue, that she became pregnant by this man, that she allowed him to remain in the home for a month after she learned of his criminal history involving children, and then lied under oath about the relationship. The evidence clearly and convincingly established that although respondent-mother had obtained housing and maintained her employment, she had not truly benefited from the services designed to improve her decision-making skills so that she could keep her children safe.

Respondent-mother's actions when parenting time was allowed also illustrated that she had not benefited from services. After the adjudication and initial disposition, parenting time with the children appeared to be going well. Respondent-mother was engaged, and she brought food and necessary supplies to the visits. Then, in December 2021, respondent-mother suddenly stopped visiting the children and communicating with the caseworker. Because of her actions, respondent-mother went several months without seeing the children. When in-person parenting time resumed in March 2022, respondent-mother was less engaged, she failed to follow the parenting time polices, she did not confirm her intent to attend, and she brought unauthorized individuals to the visits, including Jordan.

During the termination hearing, significant attention was given to the status of respondent-mother's child protective proceeding in Menominee County related to DJ. Child Protective Services investigated the family after DJ's birth because of respondent-mother's open case in Gogebic County. A petition was filed in Menominee County, but the court declined to take jurisdiction. Instead, DJ was permitted to remain in respondent-mother's care pursuant to an alternative services docket. The Menominee County Department of Health and Human Services found that respondent-mother was in compliance with her services, and Menominee County service providers were critical of the contracting agency's decision in this case to seek termination of respondent-mother's parental rights.[3] Respondent-mother relied on these events to support her assertion that the three boys would be safe in her care. However, the Menominee County case does not compel a conclusion that respondent-mother is able to safely and independently care for LA, IA, and MD. There was testimony that respondent-mother continues to receive a multitude of services to assist her in functioning and caring for DJ. Rather than demonstrate that respondent-mother was prepared to parent the children in this case, the Menominee County case highlights that at the time of the termination hearing, respondent-mother still did not have the skills to safely parent her children.

---

[3] Moreover, the service providers involved in the Menominee County case appeared to minimize the severity of the sexual assault allegations and trauma assessments. Although these providers noted that Jordan was then removed from respondent-mother's home, there was no recognition of her pattern of selecting partners or associates with habits detrimental to providing a safe environment for raising a child.

The foregoing evidence clearly and convincingly demonstrates that many of the conditions that led to the adjudication continued to exist. Further, the record clearly established that the obstacles to reunification would not be removed within a reasonable time. The children had been in care for 22 months. Respondent-mother was given more than a year to benefit from the case service plan and make meaningful changes to her life, but she was unwilling or unable to do so. There was no evidence that if respondent-mother were allowed additional time, the end result would be any different. Admittedly, at the time of the termination hearing, respondent-mother was employed and had suitable housing, and there was also evidence that she was finally receiving mental health therapy. Considering the timing, however, respondent-mother's actions appear to be motivated more by the scheduling of the hearing on the permanent-custody petition than the sudden desire to be reunited with her children. Moreover, there is little evidence that respondent-mother's less than two-month compliance with the treatment plan represented a forward trend, particularly considering respondent-mother's lack of progress during the preceding year. Accordingly, the trial court did not clearly err by finding that the conditions that led to the adjudication would not be rectified within a reasonable time.

Termination of parental rights under § 19b(3)(c)(*i*) is warranted when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change" in the conditions that led to the trial court assuming jurisdiction of the child. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). Petitioner met this evidentiary burden by clear and convincing evidence. Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondent-mother's parental rights under § 19b(3)(c)(*i*).[4]

## III. BEST INTERESTS

Respondents also challenge the trial court's finding that termination of their parental rights was in the children's best interests. We conclude that the trial court did not err in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id*. at 713-714. In addition, the trial court should consider the child's safety and well-being,

---

[4] Again, although one statutory ground is necessary to terminate parental rights, *In re Trejo*, 462 Mich at 355, we note that the statutory grounds of MCL 712A.19b(3)(g) and (j) were established by the evidence. "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711.

including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the child[]'s best interests." *In re White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id*. at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App at 129.

### A. DOCKET NO. 366691 (RESPONDENT-FATHER)

The trial court did not clearly err when it found that termination of respondent-father's parental rights was in LA's best interests.

LA was only 1½ years old when he was placed in foster care in April 2021. At the time of termination, he was almost four years old. LA had been in foster care for 22 months. Before the initiation of the child protective proceeding, respondent-father had no relationship with his child. Respondent-father admitted that his neglect of LA was related to his long history of substance abuse and housing insecurity. Rather than work on addressing these issues, respondent-father continued to make choices that prevented him from having a relationship with LA. Because respondent-father would not be released from prison before December 2025, it would be unreasonable to have LA wait another two years for the opportunity to have a safe, stable, and permanent living environment.

By contrast, LA was doing well in the foster home placement. The foster parents were meeting all of LA's needs and were willing to adopt LA if the court terminated respondents' parental rights. Moreover, LA would have the benefit of living and growing up with his half-siblings, IA and MD, because the foster parents were also willing to adopt them. Considering this record, the trial court did not clearly err when it found that termination of respondent-father's parental rights was in LA's best interests.

### B. DOCKET NO. 366692 (RESPONDENT-MOTHER)

Respondent-mother also challenges the trial court's finding that termination of her parental rights was in IA, MD, and LA's best interests. We find no error in this regard.

While living in respondent-mother's home, IA, MD, and LA were exposed to, among many other things, domestic violence, the sexual abuse of their sisters, and medical, physical, and educational neglect. Trauma assessments indicated that both IA and MD had experienced complex trauma, which affected several aspects of the children's development. The clinician performing the assessments explained that 14-year-old IA's "development has been significantly compromised by his continuous traumatic experiences, which he has primarily internalized through emotional withdrawal, anxiety, and depression." The clinician further believed that permanency was necessary and would provide IA with "predictability, consistency of care, and security from which to build trust." Similarly, 12-year-old MD also experienced complex trauma

-10-

while in respondent-mother's care. The clinician performing MD's assessment explained that the child's "complex trauma experiences have led his brain to become focused on survival and readiness to respond to threat using instinctual responses of fight, flight, freeze, or shutting down." It was further explained that when a brain's energy is focused on survival, it is unable to focus on, or access, higher executive function needed to learn, reason, and regulate. The clinician found that MD's most important need was dependability from loving and committed caregivers who established emotional connections to help him manage his overwhelming thoughts and emotions.

The trauma assessments confirm that respondent-mother's abuse and neglect took a tremendous toll on the children's mental, physical, and emotional well-being. Indeed, when placed in foster care, the foster mother testified regarding IA and MD's inability to function in a home with rules and structure. The children advised that respondent-mother's home was a violent, chaotic environment, where they were given chores and forced to care for other minor children. If the children finished packaged foods, they were subject to punishment. The domestic violence even had an impact on LA, who experienced nightmares and was aggressive with other children in daycare. The evaluator delineated the significant individualized support that the children needed to help them navigate their world, process the trauma, and develop the necessary coping skills. The children also required stability and permanence. The record clearly demonstrates that because respondent-mother had not adequately addressed her own issues, she was not equipped, and may never be equipped, to address her children's needs.

By contrast, the foster parents were meeting all the children's needs. In addition to providing for the children's basic physical necessities, the foster parents insured that the children were regularly receiving the mental health care they required. When the children arrived in the foster home in April 2021, they were behind in their educational programs. Although respondent-mother claimed she homeschooled the children, IA disclosed that she did not do this. The foster parents worked with the children to improve their educational progress and they continually advocated for additional educational support from the schools. The foster parents also created structure for the children and implemented appropriate disciplinary techniques. As a result of these efforts, the children's behavior issues had improved tremendously.

Moreover, IA and MD were both old enough to understand the seriousness of the events that occurred in the home and traumatized them and their siblings.. They understood that their sisters had been sexually abused by a trusted uncle in the home. According to statements made in their trauma assessments, IA believed that respondent-mother knew what was occurring in the home. MD stated that they never said anything about the abuse because they were afraid it would hurt respondent-mother. This knowledge clearly took an emotional toll on the boys and put a burden on them that they were ill-equipped to handle. The risk of revisiting this type of trauma was very real should the children be returned to respondent-mother's care.

Evidence of the children's preferences was also elicited during the termination hearing. IA consistently indicated that while he loved his mother, he did not wish to return to her care. He did not believe that she was able to care for them. MD was more conflicted. He expressed the desire to return to his mother's home, but it always appeared to be with reservation.

Because three-year-old LA was much younger, his circumstances were slightly different. He was 1½ years old when placed in the foster home. Indeed, he had spent as much time in foster

care as he had living with respondent-mother. When LA arrived in the foster home, he was nearly nonverbal. The foster parents ensured that he received the speech therapy he required and, after nine months of services, he was one of the most talkative children in his preschool. However, LA also had aggression issues that he exhibited with his classmates. LA received behavioral therapy through his preschool program.

The evidence demonstrated that because respondent-mother had not addressed her own mental health issues, she was unwilling or unable to establish the stability necessary to properly parent her children and provide them with a safe and stable home environment. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). A preponderance of the evidence supported a finding that the foster home was preferable to any home respondent-mother could provide for the children. Further, the trial court may consider the possibility of adoption. *In re White*, 303 Mich App at 713. The foster parents expressed a willingness to adopt the children in their care should the court terminate respondents' parental rights. This would allow the children to be raised with their biological siblings. Considering the foregoing, the relevant factors, on balance, weighed in favor of terminating respondent-mother's parental rights to IA, MD, and LA. Termination would provide an avenue by which all three children could achieve the stability, finality, and permanence they required. Accordingly, the trial court did not clearly err by finding that termination of respondent-mother's parental rights was in the children's best interests.

Affirmed.

/s/ Anica Letica
/s/ Mark J. Cavanagh
/s/ Brock A. Swartzle

-12-